No. 99-057

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 181

295 Mont. 297

983 P.2d 396

BENJAMIN F. FLAIG and VERNA B. FLAIG,

Plaintiffs and Appellants,

v.

MARVIN W. GRAMM and EDITH W. GRAMM,

Defendants and Respondents.

APPEAL FROM: District Court of the Twentieth Judicial District,

In and for the County of Lake,

The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

Douglas Harris; Harris & Callaghan, Missoula, Montana

For Respondents:

Matthew H. O'Neill; French, Mercer, Grainey & O'Neill, Polson,

Montana

Submitted on Briefs: June 3, 1999

Decided: July 27, 1999

Filed:

No

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

**¶1. Benjamin and Verna Flaig (hereafter the Flaigs) appeal the judgment and order of the Twentieth Judicial District Court.**

**¶2. We affirm in part and reverse in part.**

**¶3. We restate the issues as follows:**

**¶4. 1. Whether the District Court erred in concluding that the Flaigs have neither an easement by estoppel or implication nor an equitable servitude upon the Gramms' property.**

**¶5. 2. Whether the District Court erred in finding that the Flaigs' breach of the well agreement was material.**

Standard of Review

**¶6. We review a district court's conclusions of law to determine whether they are correct. Steer, Inc. v. Dept. of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603. We review a district court's findings of fact to determine whether they are clearly erroneous. Interstate Production Credit v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287.**

Factual and Procedural Background

¶7. The Flaigs and Marvin and Edith Gramm (the Gramms) own adjoining lots on Flathead Lake in Lake County. In 1984 the Flaigs and Gramms orally agreed to share a water well that would be drilled on the common boundary between their lots (hereafter, the well agreement). They agreed that they would each pay one-half of all costs related to the installation, maintenance and operation of the well. They drilled and constructed a well, and they apparently placed the well pump and electrical controls in the basement of the Gramms' house. The Gramms and the Flaigs agreed that the Flaigs would pay their share of the electrical costs of the well by installing and maintaining a yard light for the benefit of both lots. The Flaigs never otherwise contributed to the electrical costs of operating the water system. Following a survey in 1996, the parties discovered that the well was not on their common boundary but was entirely on the Gramms' property.

¶8. In 1996 the yard light burned out. The Gramms requested that the Flaigs replace the light. The Flaigs did not replace the light, and the Gramms replaced it at their own expense. The Gramms told the Flaigs that they would not turn their water on until the Flaigs reimbursed the Gramms for the cost of the yard light. The District Court found that "[the Gramms] testified that in the fall of 1996, when advised that the water would be cut off, [the Flaigs] advised that [the Gramms] would have to return the original investment in the well and water system."

¶9. In spring of 1997, the Gramms tendered $2,500, the value of the Flaigs' original investment in the well and water system, to the Flaigs. The Flaigs apparently rejected this tender. That same spring, the Gramms refused to turn the Flaigs' water on or to let the Flaigs turn on their water. In August 1997 the Flaigs filed a Complaint against the Gramms. Within 30 days of the trial, the Flaigs tendered to the Gramms $70, that sum representing the amount that the Gramms claimed that the Flaigs owed them for replacement of the yard light. The Gramms refused the tender. At an unspecified time, the Gramms installed an electrified fence separating their property from the Flaigs.

¶10. The District Court made the following conclusions: that maintenance of the yard light was a condition precedent to the Gramms' continued performance of the contract. The Flaigs breached the well agreement by failing to maintain the yard light; they acknowledged their breach of contract; and they agreed to terminate the contract upon repayment of their original investment. The Flaigs' tender of performance during the pendency of the lawsuit was an inadequate tender of

performance. The Gramms' electrified fence is "unneighborly" but not a private nuisance to the Flaigs. Further, the District Court concluded that the parties "would likely have perpetual conflicts over any continuing common well agreement."

¶11. The District Court ordered that the well agreement was terminated, that neither party's property is subject to an easement that relates to the well, and that the Gramms pay the Flaigs $2,500, the value of their original investment in the well. The Flaigs filed a combined motion for a new trial and for altered or amended findings of fact, conclusions of law, and judgment. The District Court denied both motions. The Flaigs then brought this appeal.

¶12. 1. Whether the District Court erred in concluding that the Flaigs have neither an easement by estoppel or implication nor an equitable servitude.

¶13. The Flaigs argue that they have an easement by estoppel on the Gramms' land. Relying on Kelly v. Wallace, 1998 MT 307, 292 Mont. 129, 972 P.2d 1117, the Flaigs assert that they have detrimentally relied on the Gramms' representation that the Flaigs would have permanent use of the well and that the Gramms would accept $70 to settle their dispute. The Flaigs also argue that the Gramms should be estopped from taking unconscionable advantage of their wrong, which the Flaigs appear to assert lay in the Gramms' shutting off the Flaigs' water and erecting an electrified fence on the boundary between their properties.

¶14. We have previously concluded that "[e]quitable estoppel is not favored and will be sustained only upon clear and convincing evidence." Ducham v. Tuma (1994), 265 Mont. 436, 441, 877 P.2d 1002, 1006 (citation omitted). In *Kelly*, we recognized six essential requirements under the doctrine of equitable estoppel, including that "there must be conduct, acts, language, or silence amounting to a representation or concealment of material facts." *Kelly*, ¶ 40. Further, in Godfrey v. Pilon (1974), 165 Mont. 439, 448, 529 P.2d 1372, 1377, we concluded that both misrepresentation and detrimental reliance "are necessary for a finding of estoppel."

¶15. In the present case, the Flaigs have not shown that the Gramms misrepresented any material facts. Both parties believed that the well was located on the common boundary of their properties; the parties were mutually mistaken about its location. Moreover, the District Court did not find that the Gramms told the Flaigs that they would have permanent use of the well. We note that the record is void of any

suggestion why the Gramms would presume to make such a representation about a well that they believed was on the common boundary of their property and that of the Flaigs'. Even assuming *arguendo* that the Gramms represented to the Flaigs that they would have permanent joint use of the well, the Flaigs have failed to show that this was a material representation that they acted upon "in such a manner as to change [their] position for the worse." *Kelly*, ¶ 40. Finally, we note that the District Court did not find that the Gramms agreed to accept the Flaigs' tender offer of $70. Even assuming that the Gramms had agreed to accept the Flaigs' tender offer of $70, the Flaigs have not shown that they "in fact act[ed] upon it in such a manner as to change [their] position for the worse." *Kelly*, ¶ 40. Because they have not established the essential elements of equitable estoppel, we hold that the Flaigs do not have an easement by estoppel.

¶16. The Flaigs argue further that there is an implied restriction in the form of an equitable servitude that burdens the Gramms' property. Relying in part on Thisted v. Country Club Tower Corp. (1965), 146 Mont. 87, 405 P.2d 432, *overruled on other grounds by* Gray v. City of Billings (1984), 213 Mont. 6, 689 P.2d 268, the Flaigs appear to argue that following the 1996 resurvey of the Gramms' land, the Gramms took title to "an expanded boundary on Lot 11-A including a part of Flaigs' Lot 10 which held the well, with knowledge of the terms of the common water well and water lines" and subject to easements apparent or of record. This argument is also unpersuasive. In *Thisted*, a developer prepared promotional materials and form contracts that "informed the purchasers and prospective purchasers that the contemplated construction of an eleven-story tower building would contain twenty individual dwelling units." *Thisted*, 146 Mont. at 89-90, 405 P.2d at 433. However, when the developer executed deeds for the apartments, the deeds omitted mention of the restrictions "referred to in the contract[s]." *Thisted*, 146 Mont. at 93, 405 P.2d at 435. The *Thisted* Court held that "under all the facts shown in evidence . . . an implied equitable servitude attached to the transfers of the apartments in question, requiring the use of the apartments for residential purposes only." *Thisted*, 146 Mont. at 103, 405 P.2d at 440.

¶17. In the present case, the Flaigs erroneously assume that the 1996 survey resulted in a transfer of their interest in the well. The District Court's finding, which the Flaigs do not challenge, is that "following a survey in 1996, it was discovered that the well was not on the common boundary, but rather, entirely on [the Gramms'] property." The 1996 survey clarified the boundaries to the Gramms' land and

disclosed the parties' mutual mistake about the location of the well. However, the survey did not transfer the Flaigs' interest in the well to the Gramms. *Compare* Goeres v. Lindey's, Inc. (1980), 190 Mont. 172, 178, 619 P.2d 1194, 1197 (emphasis added) (concluding "an implied restriction upon the use of land should only be enforced as an equitable servitude *against a transferee* who takes with knowledge of its terms and under circumstances that would make enforcement of the restriction equitable"). We conclude that the District Court correctly determined that the Flaigs do not have an equitable servitude burdening the Gramms' land.

¶18. The Flaigs argue further that the Flaigs have an "easement by implication for co-ownership of the water well and underground water valves." Relying in part upon Graham v. Mack (1984), 216 Mont. 165, 699 P.2d 590, the Flaigs appear to argue that because there was common ownership of the well and a separation of title, they have an easement by implication. The Flaigs argue that the theory of implied easements should apply "in the context of a co-owned well." However, although the *Graham* Court recognized that implied easements may arise following separations of title in land, the Court did not determine that easements may arise following a separation of title in a well:

To find an implied easement[ ] "over the property of another, there must have been a separation of title, and a use before the separation took place which continued so long and was so obvious or manifest as to show that it was meant to be permanent, and it must appear that the easement is necessary to the beneficial enjoyment of the land granted or retained."

*Graham,* 216 Mont. at 174, 699 P.2d at 596 (citation omitted). In the present case, the Flaigs and Gramms separately owned their respective properties before they agreed to build and share a well. Thus, no use of the well occurred "before the separation [of their properties] took place." Graham, 216 Mont. at 174, 699 P.2d at 596 (citation omitted). We conclude that the Flaigs do not have an implied easement in the Gramms' land.

¶19. Finally, the Flaigs appear to argue that they have a right to the underground waterlines from the well to their property "as a watercourse." The Flaigs rely on Lincoln v. Pieper (1990), 245 Mont. 12, 798 P.2d 132, arguing that *Pieper* "makes clear that underground water pipes are a water conveyance system and are subject to being claimed as an easement." The Flaigs have misconstrued the Court's decision in *Pieper*.

¶20. In *Pieper*, the Court determined that "the [defendants] had at least some constructive, if not actual, notice that they took their property subject to easements in favor of the plaintiffs." *Pieper*, 245 Mont. at 16, 798 P.2d at 135. The *Pieper* Court concluded that "the use of the water system is an easement appurtenant to the water right and the land conveyed." *Pieper*, 245 Mont. at 16, 798 P.2d at 135.

¶21. In the present case, however, the Flaigs have not shown that the Gramms took their land subject to an easement or that they took their land with constructive notice of an easement. As previously discussed, the record establishes that the Gramms took their property before the well and its underground pipelines were built. Thus, *Pieper* is readily distinguished from the present case. We conclude that the Flaigs' argument is without merit.

¶22. Finally, we note that the Flaigs argue that the Gramms have erected an electrified fence that is a nuisance with "no other apparent purpose than to prevent [the] Flaigs as a well co-owner from turning on their water." The Flaigs' argument mistakenly assumes that they have an easement on the Gramms' land. Further, the Flaigs make no showing that the fence interferes with any previous use that they have made of the Gramms' land. The Flaigs do not contend that they have entered the Gramms' land to use the well. Rather, the record suggests that until the parties had their dispute over the yard light, the Gramms used the electrical connections in their basement to operate the well for the benefit of both parties. We conclude that the District Court correctly ruled that the electrified fence is not a nuisance.

¶23. 2. Whether the District Court erred in finding that the Flaigs' breach of the well agreement was material.

¶24. The Flaigs argue that the District Court erred in determining that their failure to replace the yard light was a material breach of the well agreement. Relying on this Court's decision in MT Earth Resources v. N. Blaine Estates, 1998 MT 254, 291 Mont. 216, 967 P.2d 376, the Flaigs further assert that their quiet title action is an action in equity and that this Court is required to "determine all of the issues of the case and to do complete justice." *N. Blaine Estates*, ¶ 17. The Gramms respond that the Flaigs have not contended that the District Court's findings are clearly erroneous and that it is the Flaigs, not the Gramms, who have breached the well agreement.

¶25. We have previously examined substantial breaches of contract and concluded:

[t]he general rule is that a party committing a substantial breach of a contract cannot maintain an action against the other contracting party or his predecessor in interest for a subsequent failure to perform if the promises are dependent. A substantial or material breach is one which touches the fundamental purposes of the contract and defeats the object of the parties in making the contract.

Rogers v. Relyea (1979), 184 Mont. 1, 8, 601 P.2d 37, 41 (citation omitted). *See also* Halcro v. Moon (1987), 226 Mont. 121, 125, 733 P.2d 1305, 1307 (citation omitted) (concluding that "[a] breach which goes to only part of the consideration, is incidental and subordinate to the main purpose of the contract, and may be compensated in damages does not warrant a rescission"); E. Allan Farnsworth, Contracts § 8.16, at 611 (1982) (concluding that "[i]n order for a breach to justify the injured party's suspending performance, the breach must be significant enough to amount to the nonoccurrence of a constructive condition of exchange"). Whether the Flaigs' failure to replace the yard light was a material breach of the well agreement is a question of fact. *See* Sjoberg v. Kravik (1988), 233 Mont. 33, 38, 759 P.2d 966, 969 (citation omitted) (recognizing "the determination of whether a material breach exists is a question of fact").

**¶26. We conclude that the Flaigs' failure to replace the yard light was not a material breach of the well agreement. The Flaigs' failure to replace the yard light did not defeat the primary purpose of the well agreement, which was to provide the parties with well water. We hold that the District Court's finding that the Flaigs materially breached the well agreement is clearly erroneous.**

**¶27. Having concluded that the Flaigs' breach was immaterial, we examine its legal effect. In Cady v. Burton (1993), 257 Mont. 529, 851 P.2d 1047, we concluded:**

A breach which goes to only a part of the consideration, is incidental and subordinate to the main purpose of the contract, and may be compensated in damages does not warrant a rescission of the contract; the injured party is still bound to perform his part of the agreement, *and his only remedy for the breach consists of the damages he has suffered therefrom.* A rescission is not warranted by a mere breach of contract not so substantial and fundamental as to defeat the object of the parties in making the agreement.

*Cady*, 257 Mont. at 538, 851 P.2d at 1053 (emphasis added) (citation omitted). Because the Flaigs' failure to replace the yard light was an immaterial breach of the well agreement, the Gramms were not justified in suspending their performance by shutting off the Flaigs' water. Compare Liddle v. Petty (1991), 249 Mont. 442, 446, 816 P.2d 1066, 1068 (concluding "[i]f one of the contracting parties materially breaches the contract, the injured party is entitled to suspend his performance") (emphasis added). We hold further that the District Court erred in terminating the well agreement. The Gramms are still bound to perform under the well agreement; their remedy for the Flaigs' breach of the well agreement "consists of the damages [they have] suffered therefrom." Cady, 257 Mont. at 538, 851 P.2d at 1053 (citation omitted). Because these holdings are dispositive, we do not reach the arguments raised by the parties regarding whether the Flaigs' tender of $70 was inadequate; whether the District Court erroneously implied a term of forfeiture in the well agreement; or whether the District Court erred in refusing to order specific performance.

**¶28. We recognize, however, that the District Court found that the parties "would likely have perpetual conflicts over any continuing common well agreement." The Flaigs and the Gramms are free to modify the well agreement to ensure that its primary purpose can be met with a minimum of disruption and to develop a different means for sharing the costs of operating and maintaining the well. In this light, we note the Gramms' argument that because "[t]he well is located a few short feet from the boundary of the property, there is no reason in the world why a shutoff valve cannot be placed on [the Flaigs'] side of the fence." On remand to District Court, the parties might well consider such an arrangement so as to avoid further conflicts.**

**¶29. We reverse and remand for further proceedings to determine the damages that the Gramms have incurred as a result of the Flaigs' breach of the well agreement.**

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ JAMES C. NELSON

/S/ JIM REGNIER

No

/S/ TERRY N. TRIEWEILER