DA 06-0498

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 191

WILLS CATTLE COMPANY,

      Plaintiff and Appellant,

  v.

WILLIAM J. SHAW and E. KATHLEEN SHAW,

      Defendants and Respondents.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DV-01-755
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Holly Franz, Franz & Driscoll, PLLP, Helena, Montana

      For Respondents:

      W. Carl Mendenhall, Worden Thane PC, Missoula, Montana

Submitted on Briefs:  June 20, 2007

Decided:  August 7, 2007

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Wills Cattle Company (the Company) appeals from a judgment of the Fourth Judicial District Court, Missoula County, which decreed that the Company had no ownership interest in two irrigation ditches on land owned by William J. Shaw and E. Kathleen Shaw (the Shaws) and dismissed the complaint. We affirm.

¶2 We restate the issues on appeal as follows:

¶3 1. Did the District Court err in concluding the 1964 deeds conveying water rights were ambiguous?

¶4 2. Did the District Court err in determining that Wills Cattle Company has no ownership interest in either the middle or north McDonald irrigation ditches on the Shaws' property?

## BACKGROUND

¶5 The factual background giving rise to this case begins over a century ago when two brothers, Tom McDonald and John McDonald, established homesteads in the Union Creek valley, east of Bonner, Montana, on Sections 15 and 16, Township 13 North, Range 16 West. The brothers appropriated water from Union Creek and dug irrigation ditches to flood irrigate their land. Both Sections 15 and 16 were eventually purchased by W.K. Wills and were operated as a single ranch called the Wills Ranch Company. W.K. Wills sought adjudication that he was the owner of the McDonald water rights. In a district court decision and in *Wills v. Morris*, 100 Mont. 514, 50 P.2d 862 (1935), it was decreed that W.K. Wills was the owner of the Tom McDonald water right in the amount

2

of 162 inches of water and of the John McDonald water right in the amount of 124 inches of water.

¶6     W.K. Wills irrigated Sections 15 and 16 with the McDonald water rights using four ditches: the main McDonald ditch, the north McDonald ditch, the middle McDonald ditch, and the Lower Arkansas ditch. The main McDonald ditch and the Lower Arkansas ditch started on Section 15 and ended on Section 16. The middle and north McDonald ditches started on Section 15, ran west toward Section 16, but ended before reaching Section 16.

¶7     In 1964, the Wills family dissolved the Wills Ranch Company and divided the ranch, creating a self-sustaining ranch for each of W.K. Wills' sons, Ernest, Roy, and William. The property granted to Ernest included the north half of Section 16. The grant to Ernest also provided the following:

> Together with the following rights, and all ditches, dams, flumes and rights of way appurtenant thereto, all of which rights were adjudicated in Cause No. 12038, W. K. Wills vs. H. W. Morris, et al, Fourth Judicial District Court, Missoula County, Montana, to-wit:
>     (a) An undivided one-half interest in and to 120 inches of water from Union Creek appropriated through the McDonald ditches;
>     (b) An undivided one-half interest in and to 100 inches of water from Union Creek, appropriated May 1, 1892, for use in Sections 15 and 16, Township 13 North, Range 16 West;
>     (c) 80 inches of water from Union Creek, appropriated August 31, 1888, through Wills-Davis & Smith joint ditch.
>     (d) Two-thirds of the waters of Nelson Creek.

Paragraphs (a) and (b) referred to the Tom McDonald and John McDonald water rights, respectively. The deed failed to reflect the greater number of inches decreed by the Montana Supreme Court in *Wills v. Morris*, but that is not at issue in this case.

3

¶8     The property granted to Roy included parts of Section 15 and the following:

Together with the following rights, and all ditches, dams, flumes and rights of way appurtenant thereto, all of which rights were adjudicated in Cause No. 12038, W. K. Wills vs. H. W. Morris, et al, Fourth Judicial District Court, Missoula County, Montana, to-wit:
    (a) An undivided one-fourth interest in and to 120 inches of water from Union Creek appropriated through the McDonald ditches;
    (b) An undivided one-fourth interest in and to 100 inches of water from Union Creek, appropriated May 1, 1892, for use in Sections 15 and 16, Township 13 North, Range 16 West;
    (c) 75 inches of water from Arkansas Creek, appropriated July, 1892, through the Vaughn ditch.
    (d) 70 inches of water from Union Creek, appropriated July 1, 1891, through Ben Parsons ditch.

Similarly, the property granted to William included parts of Section 15 and an undivided one-fourth interest in the McDonald water rights only, with identical paragraphs (a) and (b) above.  No maps or legal descriptions accompanied the deeds which showed or described the location of the ditches.  According to the dissolution agreement, the parties were to exercise their water rights on a rotating week on/week off basis.  The parties also agreed to each bear the cost of maintaining the water rights, ditches and flumes in proportion to their ownership interests.  The dissolution agreement was signed by W.K.'s sons, Ernest, Roy and William, and grandsons, Sidney, William and Roy.

¶9     Ernest's family continued to ranch Section 16, eventually forming the Wills Cattle Company.  Sidney Wills, Ernest's son, now currently operates the Company.  Likewise, sons William and Roy, and Roy's son William (Bill), continued to ranch Section 15 until they sold their parcels outside the family.  For a time after that, Sidney leased Section 15.  It was later leased by Leslie Woldstad who owned other property in the area.  In 1999, the Shaws purchased the land in Section 15 previously held by William and Roy, and

4

accordingly, also acquired a one-half interest in the McDonald water rights. While both sections were traditionally flood irrigated with their respective water rights, the Shaws immediately began to install a sprinkler irrigation system. To facilitate the sprinkler system, the Shaws filled in the middle and north McDonald ditches.

¶10 Upon seeing the destruction of the ditches, the Company filed a complaint for declaratory relief, injunctive relief, damages, and certification to the water court. The Company alleged that the Shaws failed to recognize that the parties held an undivided joint interest in the ditches, and requested that the court declare the Company's interest. The Company argued that the 1964 deed to Ernest clearly granted a one-half interest in all the McDonald ditches, plural, which included the north and middle ditches the Shaws destroyed.

¶11 A bench trial was held on February 15 and 16, 2005, where several witnesses testified regarding the use of the ditches in watering each section. Sidney Wills, born in 1940 and president and stockholder of the Company, had resided on the ranch all his life. According to Sidney, even though the middle McDonald ditch did not reach Section 16, it was important for fully irrigating that section. He testified that the middle ditch was used early in the season because it was the hardest ditch to fill, that it topographically ended on high ground so that it would flow onto lower ground on Sections 15 and 16, and that there were approximately fifteen acres on Section 16 that could only be watered by using the middle ditch. Further, Sidney stated that the water from the middle ditch would moisten the ground so that water from other ditches would more easily cover the ground.

5

¶12 Sidney also described the north McDonald ditch, which traveled north from where it was appropriated on Section 15 and diverted over Union Creek through a flume, then turned west and ended before reaching Section 16. The Shaws had filled in the portion of the ditch that ran east to west. Sidney testified that this ditch was also on high ground and Section 16 was downhill from where the ditch ended. He stated that approximately six to eight acres on Section 16 could only get water through the north McDonald ditch. Sidney testified that the only time he cleaned or maintained the ditches on Section 15 was when he leased Section 15 property, and in fact, the flume that carried water north over the top of Union Creek had been unused since the late 1970s. Thus, the last time McDonald water reached the north McDonald ditch was in the late 1970s.

¶13 When asked about the language of the 1964 deed from W.K. to Ernest, Sidney stated that his understanding of the words "McDonald ditches" in paragraph (a) of the 1964 deeds referred only to the McDonald ditches and not the Arkansas ditch, but then admitted he was not sure if it included the Arkansas ditch. He stated that one could not tell from looking at the deed itself, and if historic use was taken into account, "ditches" would include the Arkansas ditch.

¶14 William Shaw testified that prior to purchasing the property, he had told Sidney he was going to install a sprinkler irrigation system, but they did not discuss ditches. He stated that when inspecting the property prior to purchase, he noticed that the north McDonald ditch was not operating because the flume had washed out and the ditch was overgrown. He observed that the main McDonald ditch and the Lower Arkansas ditch were set up to carry McDonald water over Section 15 and into Section 16. Shaw stated

6

that he saw no physical evidence nor had any conversations that led him to believe Sidney had an interest in the middle and north McDonald ditches, especially since they ended on Section 15. Shaw further testified that after purchasing the property, he never saw Sidney maintain the ditches, and that neither Sidney or Shaw used the middle ditch in the summer of 2001—the summer after Shaw installed the sprinkler lines, but before he filled in that ditch.

¶15 Another Wills family member testified about the irrigation ditches, William (Bill) Wills, W.K.'s grandson and Sidney's cousin. Bill testified that he was born in 1939, and had resided on the ranch property in the Union Creek valley until 1981. Apart from two years in the Army and some part-time logging, Bill was actively involved in the operation of his father, Roy, and Uncle William's ranch property, including Section 15. Bill testified that he never saw water from the middle McDonald ditch go over the surface of the ground onto Section 16. He stated that it "just sinks and subs up down below." He stated that the subbing would occur on Section 16, which would benefit Section 16, filling up the ground water. He stated that he was not aware of anyone from Section 16 ever coming on the property to run water down the middle ditch or the north ditch to irrigate Section 16 lands, but admitted that if subbing occurred when he, his father, or his uncle filled the ditch, there was no need for Ernest or Sidney to come over and use the ditch. He stated the water from the north ditch would run over the surface back into Union Creek. He also testified that he never saw anyone from the Company maintain or repair the ditches. Bill stated that he did not believe that the Company had any ownership interest in the middle or north McDonald ditches.

7

¶16 Leslie Woldstad had leased property on Section 15 starting in 1987 after the Willses sold it, and continued to do so after the Shaws' purchase. He testified that he was familiar with the irrigation ditches. He said he had never seen anyone from the Company come on the land and flood irrigate that property, nor had he seen anyone maintain or repair the north or middle McDonald ditches. Woldstad stated that he used the middle ditch on a regular basis, so the Company would have received a benefit. He stated that Sidney claimed that if Woldstad used the middle ditch first, it made his area easier to irrigate. Woldstad said that he was never able to get water to the north side of the creek through the north McDonald ditch because the flume was out.

¶17 The District Court concluded that the 1964 deeds were ambiguous as they did not contain maps or any other specific identification of the number or location of the ditches used with the water rights conveyed by the deeds. Thus, the court looked to extrinsic evidence to determine the intent of the parties at the time the deeds were signed and recorded. Of note, the court found that when operated as a single ranch, both sections were irrigated by using the four historic ditches, and that the "use of all four historic ditches is necessary to fully and adequately irrigate Sections 15 and 16 with the McDonald water rights. The four McDonald ditches are all permanent ditches constructed to conform to the topography of the land and to most efficiently flood irrigate the properties." The court further found:

> While the middle and north McDonald ditches end near the property line on what is now the Shaws' property, due to the elevation of the property, there is conflicting testimony concerning whether they have always been used to flood irrigate the Wills Cattle Company property in a manner similar to that described by Tom McDonald in his testimony at the *Wills v. Morris* trial.

8

At best, there is indication of some seep or sub-irrigation from those ditches (middle and north McDonald).

¶18 The court concluded that the best interpretation of the deed language was that the parties to the deeds only intended to convey an interest in those ditches that actually historically conveyed water to the respective ranches. Thus, the District Court determined that the Company had no ownership interest in the middle or north McDonald ditches. The Company's complaint was thereby dismissed and attorney fees were awarded to the Shaws. The Company appeals.

## STANDARD OF REVIEW

¶19 A transfer of property is to be interpreted in like manner with contracts in general. Section 70-1-513, MCA; *Van Hook v. Jennings*, 1999 MT 198, ¶ 10, 295 Mont. 409, ¶ 10, 983 P.2d 995, ¶ 10. The construction and interpretation of a contract is a question of law. *Baker Revocable Trust v. Cenex Harvest States*, 2007 MT 159, ¶ 19, 338 Mont. 41, ¶ 19, __ P.3d __, ¶ 19 (citations omitted). The initial determination of whether an ambiguity exists in a contract is also a question of law. *Baker Revocable Trust*, ¶ 19 (citations omitted). If the language of a contract is ambiguous, a factual determination must be made as to the parties' intent in entering into the contract, which is a question of fact for the court to decide in a case that is tried without a jury. *Baker Revocable Trust*, ¶ 19 (citations omitted); *Security Abstract & Title v. Smith Livestock*, 2006 MT 265, ¶ 17, 334 Mont. 172, ¶ 17, 146 P.3d 732, ¶ 17. We affirm the factual findings of a district court sitting without a jury unless those findings are clearly erroneous. *Steiger v. Brown*, 2007 MT 29, ¶ 16, 336 Mont. 29, ¶ 16, 152 P.3d 705, ¶ 16 (citations omitted). A district

9

court's findings are clearly erroneous if they are not supported by substantial evidence, if the district court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. *Steiger*, ¶ 16 (citations omitted).

## DISCUSSION

¶20 **ISSUE 1: Did the District Court err in concluding the 1964 deeds conveying water rights were ambiguous?**

¶21 The determination of whether an ambiguity exists in a contract is to be made on an objective basis. *Baker Revocable Trust*, ¶ 20 (citations omitted). An ambiguity exists if the language of the contract is susceptible to at least two reasonable but conflicting meanings. *Baker Revocable Trust*, ¶ 20 (citations omitted).

¶22 In this case, W.K. Wills granted each of his sons certain tracts of land and certain water rights, as well as "all ditches, dams, flumes and rights of way appurtenant" to the water rights. Each son received a percentage of the Tom McDonald water right from Union Creek appropriated through the McDonald ditches, as well as a percentage of the the John McDonald water right, although the deeds did not specify which ditch carried the John McDonald water. The deeds made no mention of the Lower Arkansas ditch, which was also historically used to carry McDonald water.

¶23 The District Court found that the four historic ditches (three McDonald ditches and the Lower Arkansas ditch) were all used to convey McDonald water, and that all of these ditches were "necessary to fully and adequately irrigate Sections 15 and 16 with the McDonald water rights." The Company argues that because the deeds referred to

10

"McDonald ditches" in the plural, W.K. expressly granted an easement in the three McDonald ditches, not just the main McDonald ditch which ends in Section 16. However, Sidney admitted that because of the historic use of the Lower Arkansas ditch to convey McDonald water to the Company's property, the word "ditches" in the deeds could have been meant to include the Lower Arkansas ditch. The court concluded that the language in the deeds was ambiguous, and further, there were no maps or any other specific identification of the number or location of the ditches which would clarify which ditches were included in the conveyance of the different properties. Therefore, the District Court looked to other evidence to ascertain the intent of the parties with regard to which ditches were conveyed in the deeds to each son.

¶24 We agree with the District Court that the language of the deeds is ambiguous, and that other evidence must be used to ascertain which ditch rights were conveyed in the 1964 deed to Ernest Wills.

¶25 **ISSUE 2: Did the District Court err in determining that Wills Cattle Company has no ownership interest in either the middle or north McDonald irrigation ditches on the Shaws' property?**

¶26 Section 70-15-105, MCA, provides that a "thing is deemed to be incidental or appurtenant to land when it is by right used with the land for its benefit, as in the case of a way or watercourse or of a passage for light, air, or heat from or across the land of another." Ditches are easements that attach to land. Section 70-17-101, MCA. A transfer of real property also transfers easements which are to be used in the same manner and to the same extent as at the time the property was transferred. Section 70-20-308,

11

MCA.  An easement is created by reservation through written conveyances.  *Ponderosa Pines Ranch, Inc. v. Hevner*, 2002 MT 184, ¶ 16, 311 Mont. 82, ¶ 16, 53 P.3d 381, ¶ 16.  If a document fails to adequately fix the location of an easement, a court may ascertain the location by use.  *Ponderosa Pines Ranch, Inc.*, ¶ 16.

¶27    A water right and an easement to carry water across another's land, also known as a ditch right, are separate and distinct property rights.  *Lincoln v. Pieper*, 245 Mont. 12, 15, 798 P.2d 132, 134 (1990) (citations omitted).  Water rights and ditch rights "may be conveyed separately and the loss of one does not necessarily require loss of the other."  *Lincoln*, 245 Mont. at 15, 798 P.2d at 134 (citations omitted).  However, if a water right passes as an appurtenance, the means of conveyance of the water also passes.  *Lincoln*, 245 Mont. at 15, 798 P.2d at 134.  This Court has stated that where a right of way attaches to the

> "use of a certain ditch and water for irrigating of a farm, they will pass by the deed, even without the use of the word 'appurtenances'; for the acquisition of the easement or servitude was intended for the benefit of the estate, and by destination is to be considered as incidental to the use of and as part and parcel of the realty."  *Tucker v. Jones*, 8 Mont. 225, 231, 19 P. 571, 573 (1888).  Thus, this Court has held that the conveyance of a tract of irrigated land with its appurtenances also conveys the ditch, as well as the water right, necessary to the cultivation, use and enjoyment of the land, just as fully as though the grantor had described it in express terms in the deed itself.

*Lincoln*, 245 Mont. at 15-16, 798 P.2d at 135 (citations omitted).

¶28    Necessity and historical beneficial use are critical factors in determining whether a ditch right is appurtenant to a water right.  *Lincoln*, 245 Mont. at 16, 798 P.2d at 135; *Castillo v. Kunnemann*, 197 Mont. 190, 196, 642 P.2d 1019, 1023-24 (1982).  In *Lincoln*,

12

the plaintiffs sued when the defendants disconnected water pipes leading from a water tank on the defendants' property to the plaintiffs' property. *Lincoln*, 245 Mont. at 14, 798 P.2d at 134. To determine whether the water conveyance system was appurtenant to the plaintiffs' property, the Court looked at whether the water conveyance system was necessary for the plaintiffs to exercise their water right. *Lincoln*, 245 Mont. at 16, 798 P.2d at 135. In that case, the water conveyance system was necessary as it was the only means of carrying water from the water tank and allowing the plaintiffs to use their water right. *Lincoln*, 245 Mont. at 16, 798 P.2d at 135.

¶29    In *Castillo*, to determine whether ditch and water rights were appurtenant to the plaintiffs' property, the Court relied on testimony of the defendant that he, as prior owner of two tracts of land now owned by the plaintiffs, had irrigated those tracts with the water rights in question and the water was conveyed through the ditches running through the plaintiffs' property. *Castillo*, 197 Mont. at 196, 642 P.2d at 1023-24. Thus, based on historical beneficial use, the Court determined that the water and ditch rights were appurtenant to the plaintiffs' land. *Castillo*, 197 Mont. at 196, 642 P.2d at 1024.

¶30    Unlike in *Lincoln*, the middle and north McDonald ditches in this case are not necessary for the Company to exercise its water rights. In making its finding that the Company had no ownership interest in the middle and north McDonald ditches, the court relied on testimony of a disinterested witness, Bill Wills, that in Bill's tenure on Section 15, no one had used those ditches to irrigate Section 16. Bill and Woldstad similarly testified that, at most, Section 16 got a benefit from the sub-irrigation that occurred during the on-weeks that those ditches were being used to irrigate Section 15, but neither

13

the Company nor its predecessors actually used those ditches during its week of irrigation. Rather, the Company was able to exercise its water rights through the main McDonald ditch and the Lower Arkansas ditch. This is further supported by Shaw's testimony that, in 2001, before he filled in the ditch but after he started using a sprinkler system, neither he nor the Company used the middle ditch for irrigation that season. Finally, the only time the Company repaired or maintained the middle or north McDonald ditches was when Sidney leased Section 15, thus indicating the Company did not recognize an ownership interest in or a beneficial use of those ditches in Section 16.

¶31 To support its position that the middle and north McDonald ditches were historically used for the benefit of Section 16 through flood irrigation, the Company points to the testimony of Tom McDonald in *Wills*, 100 Mont. at 526, 50 P.2d at 866-67, where McDonald stated that the "original ditch" was used to flow water onto Section 16. However, there is no evidence that was the use at the time of the 1964 conveyances, or that Tom McDonald was even talking about the same ditches since, according to his testimony, the "original ditches were plowed up . . . ." *Wills*, 100 Mont. at 526, 50 P.2d at 866-67. Furthermore, this decree is not conclusive as to whether the north and middle ditches were appurtenant specifically to Section 16 because it adjudicated water rights to Sections 15 and 16 as one ranch.

¶32 Another factor the Court looked at in *Lincoln* in determining whether the water system was appurtenant to the plaintiffs' land was whether inspection of the chain of title or of the property would have revealed the existence of the plaintiffs' interest in the water system. *Lincoln*, 245 Mont. at 16, 798 P.2d at 135. In that case, inquiry or inspection of

14

both the chain of title and property would have revealed that the defendants' land was "burdened with easements . . . for access to the water system." *Lincoln*, 245 Mont. at 16, 798 P.2d at 135. In this case, Shaw inspected the property and saw that both ditches ended before reaching Section 16. Further, being that the 1964 deeds were ambiguous with respect to which ditch rights were conveyed to each section, a search of the chain of title would not have revealed that the Company had an easement in the middle and north McDonald ditches.

¶33 These findings support the court's conclusion that W.K. Wills' intent, in providing each of his sons with a self-sustaining ranch, was to include only those ditch rights that were historically used to convey water to the respective ranches, which, for the Company, only included ditches that actually reached the Company's land. It is within the province of the District Court, as the trier of fact, to weigh conflicting evidence, and this Court will not substitute its judgment for that of the trier of fact. *Ray v. Montana Tech of Univ. of Montana*, 2007 MT 21, ¶ 50, 335 Mont. 367, ¶ 50, 152 P.3d 122, ¶ 50. The District Court did not err in concluding that the Company did not have an ownership interest in the middle and north McDonald ditches.

¶34 We affirm the judgment of the District Court.


/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ BRIAN MORRIS
/S/ JIM RICE